2026 IL App (1st) 231225-U

FIRST DIVISION
January 26, 2026

No. 1-23-1225

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 12994 |
| | ) | |
| CHARLES SIMS, | ) | The Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Howse and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the dismissal of defendant's postconviction petition where he failed to make a substantial showing of a constitutional violation, and postconviction counsel substantially complied with the requirements of Illinois Supreme Court Rule 651(c) (eff. July 1, 2017).

¶ 2    Following a jury trial, defendant Charles Sims was found guilty of first degree murder and sentenced to 50 years' imprisonment. He now appeals from the second-stage dismissal of his petition filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)). Defendant contends the circuit court erred in dismissing his petition, where he made a

substantial showing that his trial counsel was constitutionally ineffective for failing to request a self-defense jury instruction based on a forcible felony, and his direct appeal counsel was also ineffective for not raising that claim. He further contends he was unlawfully arrested without probable cause. Last, defendant argues postconviction counsel provided unreasonable assistance by failing to adequately support certain postconviction claims with affidavits and other documentation, omitting allegations that would have avoided forfeiture of his claims, and pursuing non-meritorious claims. We affirm.

¶ 3                                          BACKGROUND

¶ 4                                            *Trial*

¶ 5      At trial, the State submitted the testimony of four occurrence witnesses to the murder: Edward Howard, who worked as a janitor at a building near the scene of the crime; and three of the victim Jimmy Parker's friends, Windy Sewell, William Evans, and Victor McMahan. Their testimony revealed that on June 2, 2011, around 2 a.m., Parker was outside an apartment building near the intersection of West Washington Boulevard and North Parkside Avenue. Defendant was inside that building, arguing with Parker through a window. At the corner of the intersection stood a group of men and women, including Evans and McMahan. Howard was picking up garbage about 25 feet down the street when he witnessed the ensuing confrontation. Sewell watched the confrontation from her third-floor window in defendant's apartment complex.

¶ 6      Defendant exited the building and accused Parker of pouring water on his sister. He punched Parker, and Parker punched defendant in return. Defendant pulled out a handgun and fired it at the ground. Parker ran from defendant's apartment and out onto the street, but defendant pursued him and shot him once. Parker fell to the ground onto his stomach and pleaded with defendant not to kill him. Defendant stood over Parker and shot him four to six more times while

saying "you think it's a joke now." Defendant then ran away before police arrived, and Parker died shortly thereafter. McMahan testified that, later on the date of the shooting, he viewed a photo spread and told police "who killed [Parker]." He declined to identify defendant from the spread, however, because he wanted to see defendant "face-to-face."

¶ 7 Chicago police detective Frank Szwedo testified that he responded to the scene of the shooting around 2:45 a.m. On the southwest corner of the intersection of Washington and Parkside, Szwedo observed large pools of blood, multiple cartridge cases, and a bullet fragment. The State entered by stipulation that, if called, forensic investigator Kathleen Gahagan would testify that she processed the scene and recovered two fired cartridge cases and a bullet fragment on the sidewalk, five cases on the parkway, and one case in the street. The cartridge cases were all 9-millimeter caliber. The State further stipulated that, if called, a forensic scientist would testify that the same gun fired all of the recovered cartridge cases, and a 9-millimeter weapon fired the bullet fragment.

¶ 8 Cook County assistant chief medical examiner Ponni Arunkumar, M.D., performed Parker's autopsy and found a gunshot wound entering his middle left back and exiting his right chest. Parker also had a wound entering his front left thigh and another entering his front right thigh. Additionally, there were gunshot wounds traveling from back to front in his left and right thighs, right knee, and into his lower buttock and out his right abdomen. Another gunshot wound traveled through his scrotum from right to left. Dr. Arunkumar recovered a bullet from Parker's left thigh. She opined that Parker's cause of death was multiple gunshot wounds and the manner of death was a homicide.

¶ 9 Chicago police officer James Hladik testified that over a month after the shooting, on July 14, 2011, he was in a covert vehicle with two partners. One partner had brought to their attention that there was an investigative alert for defendant's arrest. As they drove, Officer Hladik saw

defendant standing in a vacant lot with a group of men. The officers continued down the street and radioed for a marked vehicle unit to assist them. Hladik's partner, Sergeant Jack Costa, then entered the marked vehicle, and police drove him toward defendant's location. Hladik, who was still accompanied by another partner, waited at the end of a nearby alley in case defendant attempted to run. Sergeant Costa exited the marked vehicle and "right away" radioed, "He is running towards the alley." Defendant ran down the alley past Hladik's vehicle and through a backyard. After a foot pursuit, defendant was detained. The next day, the occurrence witnesses Howard, Sewell, Evans, and McMahan went to the police station and identified defendant from a lineup as the person who shot Parker. The State rested.

¶ 10    Defendant testified on his own behalf. His sister Nyteesha Sims also testified.[1] Their combined testimony revealed that on the night of June 1, 2011, Nyteesha was walking to defendant's apartment when "a lot of" hot water was poured on her from a window. Nyteesha reported the incident to police. Then, as she approached defendant's apartment, three men on the corner told her not to tell the police anything. A couple of hours later, in the early morning of June 2, someone started ringing the doorbell and banging on the door of defendant's apartment. A voice yelled, "Bitch, you know I didn't do that. You and your kids, y'all ain't going to be able to live over here, I will blow this motherfucking building up." Nyteesha looked out the window and saw Parker and four other men. She woke defendant, who was sleeping in his room, and told him about the water incident and the people outside threatening her and the children.

¶ 11    Defendant testified that he went to the front door and heard a male voice say, "Bitch, I am going to kill you, bring your ass outside." He retrieved a gun and walked outside, where five men

---

[1]Because defendant and his sister share the last name, we refer to defendant's sister by her first name, Nyteesha.

stood. Parker punched him in the face. The other men then circled around defendant as defendant showed them his gun. Parker yanked at the barrel of defendant's gun, and the gun went off. Parker struggled for the gun while the other men punched defendant. Parker twisted defendant's wrist, and defendant "panicked" and fired a shot. Parker's friends continued punching defendant from behind. Defendant testified that he then yanked the gun from Parker's hands, was hit in the head from behind, and fell to his knees. His vision was blurry. As he got up, he "started shooting" multiple times, but denied that he was trying to kill Parker. As defendant tried to recover his vision, he saw Parker on the ground and "walked off."

¶ 12 The trial court instructed the jury on first degree murder, the reduced offense of second degree murder, and self-defense. Relevant to this appeal, the jury received by the parties' agreement Illinois Pattern Jury Instructions, Criminal, Nos. 7.05 and 7.03 (approved Jan. 30, 2015), respectively stating the jury could find defendant guilty of second degree murder if, at the time of the killing, defendant either (1) unreasonably believed that circumstances existed which would justify the deadly force he used (*i.e.*, imperfect self-defense) or (2) acted under a sudden and intense passion resulting from serious provocation by the deceased.

¶ 13 The jury also received, by agreement of the parties, Pattern Jury Instructions, Criminal, No. 24-25.06 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 24-25.06) on self-defense, stating that a person is justified in using force when he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force. IPI No. 24-25.06 also provides that a person is justified in using force "intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent [(imminent death or great bodily harm to (himself)(another)]) [or] (the commission of _____)]." *Id.* The instruction's committee note states the blank space should be filled in with a forcible felony when applicable. See IPI Criminal

4th No. 24-25.06, Committee Note. The jury's instruction included the bracketed section that states "imminent death or great bodily harm to himself." The court and the parties apparently agreed there was no applicable forcible felony and therefore omitted the "commission of [a forcible felony]" portion.

¶ 14     As set forth, the jury found that defendant neither acted in self-defense nor committed second degree murder based on imperfect self-defense. Rather, the jury found defendant guilty of first degree murder and personally discharging the firearm that caused Parker's death. Defendant was sentenced to 50 years' imprisonment for the murder, which included a 25-year firearm enhancement. On direct appeal, we affirmed, while also correcting the mittimus.[2] *Sims*, No. 1-13-0840 (2014) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 15                         *Postconviction Proceedings*

¶ 16     Defendant subsequently filed two collateral proceedings challenging his conviction, including a *pro se* petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2016)), which the circuit court denied. On appeal, we granted counsel leave to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), and affirmed the court's denial. *People v. Sims*, No. 1-17-2184 (2019) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

---

[2]Initially, defendant's mittimus reflected that he had received two sentences of 25 years' imprisonment for two separate counts of first degree murder. A note at the bottom of the mittimus, however, stated that those two counts merged, and defendant was to receive a total sentence of 50 years' imprisonment, comprised of a 25-year sentence with a 25-year firearm enhancement. On direct appeal, we corrected the mittimus to clarify that defendant only received a total 50-year prison sentence for one murder count. *Sims*, No. 1-13-0840 (2014) (unpublished summary order under Illinois Supreme Court Rule 23(c)). The trial court subsequently entered a corrected mittimus reflecting the change.

¶ 17    In December 2015, defendant filed a *pro se* postconviction petition under the Act. He alleged, *inter alia*, that trial counsel failed to investigate and call as a witness Dr. Michael Slater, whose testimony would have contradicted that of the State's medical examiner, Dr. Arunkumar. In particular, Dr. Slater would have testified that the gunshot wounds in Parker's backside were not entrance wounds, as Dr. Arunkumar testified, but rather exit wounds. Defendant also alleged that his appellate counsel failed to raise the claims in his postconviction petition on direct appeal. The circuit court summarily dismissed defendant's postconviction petition, but we reversed the dismissal on appeal after finding that defendant set forth a claim of arguable merit. *Sims*, 2019 IL App (1st) 160456-U.

¶ 18    On remand, the circuit court docketed defendant's petition for second-stage proceedings and appointed defendant counsel. Postconviction counsel filed a supplemental petition on defendant's behalf, along with a certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017), stating she had consulted with defendant regarding his claims of constitutional deprivation, examined the trial record, and set forth an adequate presentation of defendant's claims "as best they can be ascertained given the available information at this time."

¶ 19    Counsel's supplemental petition added that defendant was arrested without probable cause, as there was no evidence that he was identified before the investigative alert or his arrest. Further alleged was that trial counsel was constitutionally ineffective for failing to file a motion to suppress the evidence collected following defendant's unlawful arrest. A supplemental detectives' report was attached in support. The report reflects that on June 2, 2011, the date of the shooting, occurrence witness McMahan viewed a photospread but stated he would "rather see a suspect in a physical lineup." The report also reflects that, on the morning of June 2, Gregory Holmes, who testified at the grand jury hearing but not at trial, reported the shooting to his parole officer and

identified the shooter as someone nicknamed "Stank" (trial testimony established that was defendant's nickname). This information was passed to detectives, who then compiled a photospread based on a search for men nicknamed "Stank." Holmes identified defendant from the spread as the shooter, described the incident and its location, and named janitor Howard as an additional witness. Detectives identified the building near the shooting as defendant's last known address but could not find defendant there. According to the report, on June 2 at 4:45 p.m., an investigative alert was issued for defendant's arrest.

¶ 20    The supplemental petition also alleged several other ineffective assistance of trial counsel claims. First, trial counsel failed to investigate multiple witnesses, including Holmes and, again, Dr. Slater. In support, counsel attached Holmes's affidavit, wherein he recanted his grand jury testimony and stated he lied about witnessing the shooting. Second, instead of stipulating to the testimony of the State's forensic investigator Gahagan, trial counsel should have called Gahagan to testify that she only processed one bullet at the scene. This testimony would have impeached the State's other witnesses, whose accounts showed that multiple bullets had been fired at Parker while he was on the ground. Third, trial counsel failed to request an additional jury instruction on self-defense: that a person is also justified in using deadly force to prevent a forcible felony, namely, mob action.[3] Referring to the trial testimony of defendant and Nyteesha, the petition alleged that Parker and his "allies" were "arguably" engaged in mob action when they beat defendant on defendant's front yard and the nearby public sidewalk.

---

[3]Section 25-1(a) of the Criminal Code of 1963 identifies three types of mob action. See 720 ILCS 5/25-1(a) (West 2010). Both before the circuit court and on appeal, defendant has only cited mob action as defined under section 25-1(a)(1), which is "the knowing or reckless use of force or violence disturbing the public peace by 2 or more persons acting together and without authority of law."

¶ 21 Last, the petition alleged that defendant was denied his constitutional right to confront Holmes, who, again, testified only at the grand jury hearing. Defendant asserted he had a right to cross-examine Holmes at trial. In support of defendant's various postconviction claims, counsel attached other exhibits, including defendant's affidavit, his arrest report, and Parker's medical reports.

¶ 22 As to postconviction counsel's efforts on defendant's behalf, the report of proceedings reflects that, prior to filing a supplemental petition, postconviction counsel informed the court that she could not obtain defendant's files from the Cook County Public Defender's Office because the office could not locate them. The circuit court ordered the office to produce the files, but the office still could not find them "anywhere." Postconviction counsel also described speaking with trial counsel, who had "no idea" where defendant's file was and had been unable to contact Holmes during defendant's trial proceedings. Postconviction counsel further reported to the court regarding her attempts to obtain the grand jury transcript and to find more information on Dr. Slater. Postconviction counsel nonetheless successfully obtained 62 files from the Chicago Police Department, as well as Parker's medical reports. As stated, she also contacted Holmes, attaching his affidavit to support the ineffective assistance of counsel claim.

¶ 23 The circuit court dismissed defendant's second-stage petition on the State's motion. Defendant appealed.

¶ 24 ANALYSIS

¶ 25 The Act provides a three-stage process for persons under criminal sentence to assert that their convictions were the result of a constitutional violation. *People v. Hodges*, 234 Ill. 2d 1, 9-10 (2009). During second-stage postconviction proceedings, the court must determine "whether the allegations in the petition and any accompanying documentation make a substantial showing

of a constitutional violation." (Internal quotation marks omitted.) *People v. Harris*, 2025 IL 130351, ¶ 33. Where the petition fails to make that requisite showing, dismissal is proper. *People v. Agee*, 2023 IL 128413, ¶ 37. Our review is *de novo*. *Id.* ¶ 34.

¶ 26                    *Ineffective Assistance of Trial and Direct Appeal Counsels*

¶ 27    Defendant first argues that trial counsel was constitutionally ineffective for failing to request the forcible felony self-defense instruction. He also argues that counsel on direct appeal provided ineffective assistance by not raising the issue.

¶ 28    This matter is controlled by the familiar standard in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a claim of ineffective assistance of counsel under *Strickland*, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced the defendant, *i.e.*, there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Keys*, 2025 IL 130110, ¶¶ 57-58. The *Strickland* standard applies to both trial and appellate counsel, and at the second stage of postconviction proceedings, a defendant must make a substantial showing as to both prongs. *People v. Randall*, 2021 IL App (1st) 191194, ¶ 63; *People v. Zareski*, 2017 IL App (1st) 150836, ¶ 49.

¶ 29    Jury instructions provide the jury with the correct, applicable legal principles and enable the jury to reach a proper conclusion. *People v. Fane*, 2021 IL 126715, ¶ 34. Counsel's choice of jury instructions and the decision to rely on one theory of defense over another are typically deemed matters of trial strategy. *People v. Ford*, 2022 IL App (1st) 172581, ¶ 49. Such choices are generally immune from ineffective assistance of counsel claims unless a defendant can show counsel's decisions were so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy. *People v. Patterson*, 2022 IL

App (1st) 182542, ¶ 65. In addition, a counsel's failure to request a jury instruction may be grounds for finding ineffective assistance where the instruction is so critical to the defense that its omission denies the defendant a fair trial. *People v. Smith*, 2025 IL App (1st) 220116, ¶ 34.

¶ 30    Defendant contends that his trial counsel was constitutionally ineffective for failing to request the forcible felony self-defense instruction. He argues that, had the jury received that specific instruction, there is a reasonable probability it would have found he acted in self-defense to prevent the forcible felony of mob action based on the testimony he proffered at trial that Parker and a group of men all beat him outside his apartment.[4] See 720 ILCS 5/25-1(a)(1) (West 2010) (defining mob action as "the knowing or reckless use of force or violence disturbing the public peace by 2 or more persons acting together and without authority of law"); see also 720 ILCS 5/2-8 (West 2010) ("forcible felony" includes any felony involving the use or threat of physical force or violence against a person). For the reasons to follow, we conclude defendant's ineffective assistance of trial counsel claim must fail because he cannot satisfy either prong of the *Strickland* standard.

¶ 31    As we have recounted, the State presented four occurrence witnesses to the shooting, whose testimony revealed that defendant exited his apartment and threw the first punch at Parker. The two entered into a physical altercation while a group of men and women stood on a nearby corner. Parker fled out onto the street, but defendant pursued Parker and shot him. Parker fell to the ground on his stomach, and defendant stood over him and shot him multiple times. Forensic testimony

---

[4]Defendant largely relies on the unpublished order *People v. Sparks*, 2017 IL App (1st) 143795-U, to support his argument regarding the self-defense jury instruction. Illinois Supreme Court Rule 23(e)(1), however, does not permit parties to cite nonprecedential orders entered under Rule 23(b) before January 1, 2021. See Ill. S. Ct. R. 23(b), (e)(1) (eff. Feb. 1, 2023).

corroborated the State's occurrence witnesses. Shell cases fired from the same gun and a bullet fragment were found outside defendant's apartment on the parkway, sidewalk, and street. This was consistent with the testimony regarding Parker's flight. Further, Dr. Arunkumar testified that Parker had several gunshot wounds entering Parker's backside, corroborating the testimony that Parker was on his stomach when defendant repeatedly shot him. There was no evidence that anyone other than defendant was armed during the shooting.

¶ 32    Defendant and his sister, on the other hand, presented a very different account of the incident. They testified that a group of five men, including Parker, were threatening to kill defendant prior to the altercation. Parker threw the first punch at defendant, and the whole group of men began punching defendant. Defendant's gun discharged twice while Parker tried to take his gun. Defendant acknowledged that he subsequently fired his gun multiple times. He nonetheless stated that his vision was blurry then and he was not trying to shoot Parker, despite the State's evidence unambiguously showing that he successfully shot Parker several times in the front and back.

¶ 33    Defendant cannot show trial counsel performed deficiently in agreeing to the self-defense jury instruction based on death or great bodily harm, or that trial counsel's trial strategy was unsound. See *People v. Ford*, 2025 IL App (1st) 231679, ¶ 79 (in determining whether counsel's decision reflected sound trial strategy, we take the record as our guide). Namely, because the jury was only instructed on death or great bodily harm self-defense, it only had to find defendant acted in self-defense against Parker's actions alone. Even the State's evidence showed Parker punched defendant at one point in their initial encounter, thus using force against defendant. The self-defense instruction based on "imminent death or great bodily harm" was reasonable in light of the trial evidence. It also required fewer questions of fact to be resolved in defendant's favor. A

reasonable defense attorney thus could have concluded this was the defense theory most likely to succeed.

¶ 34    In order to find defendant acted in self-defense to prevent mob action, on the other hand, the jury would have had to find that multiple people acted together in attacking defendant. See *People v. Bush*, 2023 IL 128747, ¶ 34 (mob action occurs where there are two or more people acting with a common purpose or agreed-upon course of action). This would have required the jury to accept the defense testimony that five men circled around defendant and beat him, while rejecting the consistent testimony of the State's four witnesses that only defendant and Parker fought while a group of men and women stood on the corner. See *People v. Kent*, 2016 IL App (2d) 140340, ¶ 19 (mere presence near a riot or disturbance is not mob action). A reasonable defense attorney could have determined a mob action self-defense instruction only would have drawn more attention to how drastically the defense's account differed from the State's overwhelming evidence. We therefore cannot say the self-defense jury instruction that trial counsel agreed on was so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would have pursued such a strategy. See *Patterson*, 2022 IL App (1st) 182542, ¶ 65. As such, defendant has failed to show trial counsel performed deficiently.

¶ 35    Defendant also cannot show he was prejudiced under the *Strickland* standard by the omission of the mob action self-defense instruction, where the jury heard all of the evidence supporting defendant's self-defense theory and rejected it by finding defendant committed first degree murder. Because the jury declined to find defendant guilty of the reduced offense of second degree murder, it necessarily rejected that defendant even unreasonably believed deadly force was necessary to prevent the threat he was faced with. See *People v. Guy*, 2025 IL 129967, ¶ 42 (first degree murder may be reduced to second degree murder where the defendant acted in imperfect

self-defense, which "occurs when there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable" (internal quotation marks omitted)). The jury simply found that defendant intended to kill Parker when he shot him multiple times.

¶ 36    Ultimately, defendant's theory of mob action self-defense is based on the same evidence that defendant presented at trial and the jury considered. Given the jury's rejection of defendant's self-defense theory, and the overwhelming evidence that defendant pursued Parker from his apartment to the street and shot him in the back several times, it is mere speculation that the jury would have reached a different outcome had they received the mob action self-defense instruction. See *People v. Redmond*, 2025 IL App (1st) 231795, ¶ 62 (quoting *People v. Bew*, 228 Ill. 2d 122, 135 (2008)) (" '*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice.' "). Similarly, had the jury received a mob action self-defense instruction, the jury would not have necessarily found that the degree of force defendant used was commensurate with the threat that he claimed Parker and the group presented. See *People v. Horton*, 2021 IL App (1st) 180551, ¶ 46 (to support a self-defense theory, a defendant must present evidence that he reasonably believed the "kind and amount of force [he] actually used was necessary" (internal quotation marks omitted)). In conclusion, because (1) defendant "received the jury's informed consideration" of his self-defense theory, (2) the jury rejected that theory, and (3) the evidence to be considered for purposes of defendant's mob action self-defense theory would be the same, defendant cannot make a substantial showing that he was prejudiced for purposes of an ineffective assistance claim. *People v. Stevenson*, 2025 IL App (2d) 240068-U, ¶¶ 22-25 (collecting cases and affirming the summary dismissal of the defendant's claim that his trial counsel provided ineffective

assistance by not requesting the forcible felony portion of the self-defense instruction);[5] see also *Keys*, 2025 IL 130110, ¶ 58 (defining prejudice under the *Strickland* standard).

¶ 37     Because defendant cannot make a substantial showing of either prong of the *Strickland* standard, his claim that trial counsel provided ineffective assistance must fail. *Id.* ¶ 57 (a defendant must satisfy both prongs of the *Strickland* test). By extension, defendant's claim that direct appeal counsel was constitutionally ineffective for not raising this ineffective assistance of trial counsel claim also fails. See *People v. Caldwell*, 2023 IL App (1st) 221586, ¶ 18 (appellate counsel is not incompetent for refraining from raising issues that are without merit).

¶ 38                              B. Arrest without Probable Cause

¶ 39     Defendant next contends that he made a substantial showing that he was arrested solely based on an investigative alert and without probable cause, in violation of the fourth amendment to the United States Constitution and the Illinois Constitution (U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6).

¶ 40     A warrantless arrest is constitutionally valid if based on probable cause. *People v. Clark*, 2024 IL 127838, ¶ 35. Probable cause exists "when the facts known to the officer at the time are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime, based on the totality of the circumstances." *People v. Gocmen*, 2018 IL 122388, ¶ 19. "The standard is the probability of criminal activity, not proof beyond a reasonable doubt or even that it be more likely than not." *Id.* Probable cause may be established by the collective knowledge of the police. *Clark*, 2024 IL 127838, ¶ 61. As defendant acknowledges, our supreme court has recently

---

[5]Cited as persuasive authority under Rule 23(e)(1). Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023) (nonprecedential orders entered under Rule 23(b) on or after January 1, 2021, may be cited for persuasive purposes).

found that investigative alerts do not automatically violate the Illinois Constitution, so long as the defendant's warrantless arrest is supported by probable cause. *Id.* ¶ 63.

¶ 41　Initially, defendant failed to argue that his arrest lacked probable cause before the trial court.[6] He thus deprived the State of the opportunity to challenge his argument with evidence of its own, and he deprived the trial court of the opportunity to decide the issue. See *People v. Hughes*, 2015 IL 117242, ¶ 46. As such, defendant's argument now that the State failed to show probable cause at trial, or that the State forfeited any new theories of probable cause, is not well taken. The State cannot forfeit new theories of probable cause when defendant never challenged the legality of his arrest before the trial court. See *People v. Rich*, 2025 IL App (1st) 230818, ¶ 37. Nonetheless, the record before us shows that the police did have probable cause to arrest defendant.

¶ 42　According to the trial record, the State's occurrence witness McMahan testified that he had spoken to defendant on the night of the shooting and later saw defendant shoot at Parker multiple times as Parker fled. That same night, he told police "who killed [Parker]" but declined to identify defendant from a photo spread because he "wanted to see [defendant] face-to-face." An investigative alert for defendant's arrest was subsequently issued. Afterwards, Officer Hladik and his partners, having been notified of the alert for defendant's arrest, saw defendant in a vacant lot. See *Clark*, 2024 IL 127838, ¶ 61 (probable cause may be established by the collective knowledge of police). When a police sergeant approached defendant in a marked vehicle and exited the

---

[6]We note that in the heading, located in the table of contents of defendant's opening brief, he asserts that his trial and appellate counsel were ineffective for failing to file a motion to suppress his arrest. Yet, in the body of his brief, defendant does not include that argument or raise it in his reply brief. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (arguments not raised in the opening brief are forfeited). Defendant forfeited the underlying probable cause issue by failing to raise it in the context of ineffective assistance. However, the State failed to address forfeiture and has therefore also forfeited the matter. See *People v. Lucas*, 231 Ill. 2d 169, 175 (2008) (the State may forfeit the issue of forfeiture). We thus address the merits of the fourth amendment claim.

vehicle, defendant fled, running down an alley and through a nearby backyard. See *Rich*, 2025 IL App (1st) 230818, ¶ 35 (flight provides police with probable cause to arrest for obstructing a peace officer if, before defendant fled, the arresting officer was justified in detaining defendant). The tentative identification of defendant as the one who shot Parker, together with defendant's flight from police provided the police with probable cause to arrest him. See *People v. Belton*, 257 Ill. App. 3d 1, 6-7 (1993) (police officers had probable cause to arrest the defendant, where they knew crimes had been committed, the defendant had been identified, and the defendant fled from police).

¶ 43    Defendant nonetheless argues that, based on the supplemental detectives' report attached to his postconviction petition, McMahan did not truly identify defendant until after the investigative alert was issued. He therefore asserts there was no probable cause supporting the investigative alert or the arrest. Even taking the detectives' report as true, however, it would only confirm that defendant's arrest was supported by probable cause.

¶ 44    As we have recounted, the detectives' report reflected that, on the day of the shooting, Holmes, who testified at defendant's grand jury proceeding, told his parole officer about the shooting, met with detectives, and identified defendant as the shooter from a photo spread. *People v. Butler*, 2021 IL App (1st) 171400, ¶ 53 (even a tentative identification may contribute to probable cause). Holmes also gave the location of the shooting, and detectives identified a building near that location as defendant's last known address. An investigative alert was issued that same day. Given the report, by the time defendant fled from police and was arrested, police had an identification of defendant as the shooter and knew defendant had lived at the apartment near the scene of the shooting. Holmes's identification of defendant, the proximity of defendant's last known residence to the scene of the shooting, and, again, defendant's flight from police all would have supported probable cause for defendant's arrest. See *People v. Buss*, 187 Ill. 2d 144, 206

(1999) (factors relevant to establishing probable cause include the proximity of the defendant's residence to the scene of the crime and the defendant's flight from police). We therefore find defendant failed to make a substantial showing that the police lacked probable cause to arrest him.

¶ 45                    C. Unreasonable Assistance of Postconviction Counsel

¶ 46    Last, we address defendant's claims that postconviction counsel provided unreasonable assistance by failing to adequately support some of his postconviction claims with documentation and affidavits, omitting allegations that would have avoided forfeiture of his claims, and pursuing non-meritorious claims. In postconviction proceedings, there is no constitutional right to counsel, and the right to counsel is a matter of legislative grace. *Agee*, 2023 IL 128413, ¶ 37. Thus, the Act only requires that postconviction counsel provide a "reasonable" level of assistance to a petitioner. *Id.* ¶ 41. This is a "significantly lower" standard of performance than the one mandated at trial by our state and federal constitutions. *People v. Custer*, 2019 IL 123339, ¶ 30.

¶ 47    Defendant's postconviction counsel in this case filed a certificate pursuant to Rule 651(c). Rule 651(c) requires counsel to (1) consult with the defendant to ascertain his claims of constitutional violations, (2) examine the record of the trial proceedings, and (3) make any necessary amendments to the *pro se* petition for an adequate presentation of the defendant's contentions. Ill. S. Ct. R. 651(c) (eff. July 1, 2017). By filing a Rule 651(c) certificate, a postconviction counsel creates a rebuttable presumption that she provided reasonable assistance. *People v. Huff*, 2024 IL 128492, ¶ 22. Defendant bears the burden of overcoming that presumption by showing postconviction counsel did not substantially comply with the strictures of the rule. *People v. Willis*, 2025 IL App (1st) 232204, ¶ 18.

¶ 48    Here, we find the record only further supports that postconviction counsel substantially complied with the limited requirements of Rule 651(c), as she thoroughly described her efforts to

the court on multiple dates and explained why certain documentation was unavailable. As we have recounted, the report of proceedings reflects that postconviction counsel spent substantial time attempting to obtain relevant documents. Her efforts included contacting the Cook County Public Defender's Office, the Chicago Police Department, and defendant's trial counsel for records. She also attempted to obtain the grand jury transcript and to contact Dr. Slater, who had apparently examined Parker's wounds. Ultimately, the Cook County Public Defender's Office and defendant's trial counsel could not locate defendant's case file. Nonetheless, counsel successfully received 62 documents from the Chicago Police Department and Parker's medical records. While defendant's trial counsel had apparently been unable to contact Holmes during defendant's trial proceedings, postconviction counsel successfully obtained an affidavit from Holmes, in which he recanted his grand jury testimony and stated he had lied about witnessing the shooting.

¶ 49 The fact that postconviction counsel did not file an affidavit explaining why some evidence was unavailable does not rebut the presumption that she substantially complied with Rule 651(c), where counsel consistently reported to the court her efforts in presenting defendant's claims. See, *e.g.*, *People v. Cooper*, 2025 IL App (1st) 231590-U, ¶¶ 29-30 (postconviction counsel provided reasonable assistance and adequately explained the absence of supporting documentation to the court on the record, despite not filing an affidavit explaining that absence);[7] *People v. Bass*, 2018 IL App (1st) 152650, ¶ 15 (postconviction counsel fulfilled Rule 651(c) duties despite not filing an affidavit explaining the absence of evidence, where the record showed counsel had explained his efforts to the court on multiple court dates and stated he was unable to "get any affidavits"). Postconviction counsel also added multiple claims, including that trial counsel was constitutionally

---

[7]Cited as persuasive authority under Rule 23(e)(1). Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023).

ineffective for failing to (1) request the mob action self-defense instruction, (2) move to suppress evidence based on defendant's arrest lacking probable cause, (3) call as a trial witness forensic investigator Gahagan, whose testimony that she only processed one bullet at the scene would have impeached the State testimony that multiple bullets were fired, and (4) call as a trial witness Holmes, as supported by Holmes's aforementioned affidavit. Even so, we note that postconviction counsel was not required to provide a comprehensive recounting of all of her efforts. See *People v. Jones*, 2011 IL App (1st) 092529, ¶ 24.

¶ 50    Citing *People v. Addison*, 2023 IL 127119, defendant nonetheless argues that postconviction counsel provided unreasonable assistance by failing to include arguments alleged in the original petition in order to avoid forfeiture, namely, that direct appeal counsel failed to raise the issues in his postconviction petition. In *Addison*, however, the postconviction counsel filed an amended petition omitting ineffective assistance of appellate counsel claims that had been included in the defendant's original *pro se* petition. *Id.* ¶¶ 23-24. Those claims were necessary to avoid forfeiture of the defendant's claims. *Id.* Because the amended petition superseded the original petition, the postconviction counsel in *Addison* essentially made the defendant's *pro se* petition "worse" by amending it. *Id.* ¶ 24; see also *People v. Cross*, 144 Ill. App. 3d 409, 412 (1986) (generally, "an amendment which is complete in itself and which makes no reference to the prior pleading supersedes it, and the original pleading ceases to be a part of the record"). Here, however, postconviction counsel filed a supplemental petition that only added to, and did not supersede, defendant's original petition. Thus, defendant's claims of ineffective assistance of appellate counsel remained part of the record, and counsel was not required to restate them.

¶ 51    Defendant also argues postconviction counsel provided unreasonable assistance by pursuing meritless claims and not withdrawing them. For instance, he argues postconviction

counsel improperly pursued a claim that defendant was denied the constitutional right to confront Holmes, who did not testify at trial. Defendant maintains counsel also failed to withdraw certain claims that lacked supporting documentation. As detailed in *Willis*, 2025 IL App (1st) 232204, ¶¶ 30-33, however, we find postconviction counsel had no duty to withdraw them because the record does not expressly show that postconviction counsel knew them to be frivolous or patently without merit, as opposed to merely weak. A postconviction counsel's decision to assert weak or meritless claims cannot rise to the level of unreasonable counsel, as otherwise, attorneys would routinely be found to be unreasonable. Rather, the record shows that postconviction counsel made the best efforts she could in presenting defendant's contentions of constitutional violations, despite the limited documentation that was available to her. Because defendant has failed to rebut the presumption that postconviction counsel substantially complied with Rule 651(c), defendant's claims that counsel provided unreasonable assistance must fail. *Id.*

¶ 52                                   CONCLUSION

¶ 53    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 54    Affirmed.